In the Matter of the Claim for Credit under Article 18 of the Labor Law, Made by RADIO CITY MUSIC HALL CORPORATION, Claimant.

RADIO CITY MUSIC HALL CORPORATION, Appellant; FRIEDA S. MILLER, as Industrial Commissioner, Respondent.

Third Department, November 12, 1941.

*McLanahan, Merritt, Ingraham & Christy* [*Francis T. Christy* and *Richard Swan Buell* of counsel], for the appellant.

*John J. Bennett, Jr., Attorney-General; Henry Epstein, Solicitor General [Francis R. Curran, Assistant Attorney-General,* of counsel], for the respondent.

CRAPSER, J. The Radio City Music Hall Corporation, appellant herein, operates an internationally known theatre in the city of New York. The entertainment provided for the patrons of the theatre consists of the showing of motion pictures and stage entertainment. The stage entertainment or presentation is furnished by a permanent organization or stock company which is made up of several groups including a chorus, glee club, ballet and orchestra, complemented by special talent or acts which are engaged for a week or longer. These acts are of various types and are listed in the schedule attached to the claim for credits; they include trained animal acts, acrobatic acts, circus acts, comedy acts, singers, dancers, jugglers, kiddy dancers, Spanish dancers and puppet manipulators. These acts are customarily booked through a professional booking agent.

The appellant employs a senior producer as an executive in charge of production. The senior producer may engage a special act after observing it at some place where it has performed or he may arrange for an audition.

When the senior producer has decided what type of performance he will produce at a given time he engages such act or acts as will fit best in the presentation. Most of the special acts were engaged to appear in the appellant's theatre during the year 1938 through oral agreements and they were paid on a weekly basis. The general conditions of these oral agreements are conceded to be similar to those set forth in the written contract which was introduced in evidence by the appellant at the hearing before the referee.

The acts or entertainers are to be distinguished from the orchestra, the ballet, the Rockettes and the glee club who are permanent employees of the appellant and are subject to its direct control. The entertainers and the members of their acts did not have the same privileges as employees of the appellant in that they were not covered by workmen's compensation insurance; they did not have the benefit of hospital service or group insurance; they were paid by voucher checks payable to the order of the act and not payroll checks, and they did not have the use of the employees' recreational facilities.

No control was exercised by the appellant over the entertainers or the acts except that the time for their performances was fixed by the director of the show and suggestions might be made as to the shortening or lengthening of the time of the act. The entertainers were required to revise the act if it was undignified or in

bad taste or indecent. They generally notified the theatre management of any change in their routine. They agreed to secure the approval of the theatre management in case of any change in the personnel of the act but the purpose of that was to assure the management that the act, with the new personnel, would be the same as the one that was contracted for.

The entertainers furnished their own equipment and costumes and their own music which was played by the theatre orchestra. No rehearsal of their acts to be performed was required except that they had to be present at the time of the dress rehearsal to know when the act would go on, what act they would follow and for the purpose of determining the lighting of the act.

Two entertainers who testified at the hearing stated that they had performed their act for twenty years and eight years respectively; that they were open to engagement by any one willing to engage the act; that they sometimes had double engagements, playing the same act at two different places, and that they exhibited their act at many other theatres. One of these entertainers employed a helper in his act and paid social security taxes in respect to such employee.

The fact that the appellant could approve changes in the act's personnel does not make the relationship of employer and employee. This right was only reserved to assure the appellant that the same act which was contracted for, in fact, was performed at its theatre.

The fact that the contract provides that the act be given in as many shows a day as may be the appellant's policy does not indicate an employee-employer relationship. The hours of performance were fixed of course to coincide with the entertainment policy of the appellant. The entertainers contracted to perform their act at the appellant's theatre for the duration of the accompanying picture, which might run for a week or many weeks.

The forty-eight hours' notice of termination was only a cancellation provision and had to be exercised by the appellant forty-eight hours prior to the close of the performance week. The notice of cancellation applied only to the succeeding performance week. After the week's engagement started there could be no cancellation of such week's contract.

The special acts received a higher rate of pay and were engaged on an entirely different basis from the appellant's regular employees. The appellant reserved the right through its senior producer to delete certain portions of special acts only if he considered them undignified or in bad taste. That was necessary to maintain the standard of performance set by the theatre and because the performances were witnessed by many children. Such a right of

control related only to the results of the act and not to the manner of accomplishing the results.

The amount of compensation received by the special acts clearly shows that the appellant paid for the unique talent of the acts rather than for their time. They were not to be engaged on a yearly or permanent basis because their attraction and drawing power would be lost by a continuous repetition of the acts day after day while the appellant's employees, such as the ballet, glee club and Rockettes, are taught and rehearsed different routines by appellant's producers, which routines changed with every new show. The appellant reserved the right in the contract to approve of any change in personnel; such was necessary in order to maintain the standard of the act which the appellant had contracted for. Appellant's senior producer testified that that form of procedure was only exercised in case the form of the act itself was modified; it related only to the results of the act and not to the manner of accomplishing the results. The lengthening or shortening of the time was only for the purpose of making it conform to the appellant's other entertainment and related to the result and not to the manner of accomplishing the result.

The artist's right to contract with others was limited by its contract with the appellant only to the extent that the act was prohibited to appear in any other competing theatre in New York city while performing at the Music Hall. Paul Gerritts, one of the special acts, had an engagement at a hotel in New York city at the time he was performing in the appellant's theatre in 1937. The costumes of the special acts could be ordered changed only when indecent or dirty.

There is no evidence to sustain the finding that the special acts were subject to complete direction and control by the appellant. (*Matter of Earle*, 262 App. Div. 789.)

The purpose of the Unemployment Insurance Law (Labor Law, art. 18) was to relieve so far as possible distress which follows involuntary unemployment by the unemployed worker and his family. The Legislature declared that in its considered judgment the public good and well being of the wage earners of this State required the enactment of the measure.

The special acts as set forth in the record herein are not wage earners within the meaning of the Unemployment Insurance Law. They have acquired a special talent which they make available to any one who wishes to purchase the same. Their business is analogous to that of a professional calling. They have expended much time and energy and expense in obtaining their special status. They have periods of inactivity which are counted upon and com-

pensated for when the value of their services is determined; it is necessary for them to have places to rehearse, costumes, properties, music, publicity and agents. All of these factors have to be taken into consideration when they determine the worth of their services. They sell their services pursuant to contract and receive compensation not as wages but as a lump sum due under a contract for the sale and rendition of a special service. They receive many times the compensation of the other employees of the appellant who are steadily engaged in a similar type of work. Paul Gerritts received $1,200 for two weeks' engagement in the Music Hall. He would have to work only five weeks to receive as much money as a Rockette received or earned in a whole year.

The distinction between an employee and an independent contractor is that the former undertakes to achieve an agreed result and to accept the direction of his employer as to the manner in which the result shall be accomplished, while an independent contractor agrees to achieve a certain result but is not subject to the orders of the employer as to the means which are used. (*Matter of Morton,* 284 N. Y. 167; *Hexamer* v. *Webb,* 101 id. 377, 384; *Beach* v. *Velzy,* 238 id. 100; *Irwin* v. *Klein,* 271 id. 477.)

Arsene Gautier, one of the witnesses sworn, was a trainer of ponies, dogs and monkeys. He sometimes doubled up, that is, he had different contracts in the same city to be performed at different hours. He sold his act to the Radio City Music Hall in 1938; it was known as Gautier's Steeple Chase, which was composed of four ponies, six dogs and one monkey. They show a few tricks, the dogs ride the ponies and jump from one pony to another and the monkey does the same thing. The Music Hall Corporation did not exercise any control over the details of performing the act whatever, that is, they could not order a dog to jump through a hoop instead of ride on top of a pony, because they had not been so trained.

All of the evidence in the case indicates that the special acts were independent contractors and not employees and, therefore, are not subject to the Unemployment Insurance Law. These acts, according to the schedule, if they had any success at all would earn more than $3,000 a year.

The decision of the Unemployment Insurance Appeal Board, holding that the individual performers who composed the special acts upon whose wages the appellant paid unemployment insurance contributions during the year 1938 are employees of appellant, should be reversed and such special acts and the individual performers working in them are held to be independent contractors and the disallowance of the claim for credit for contributions paid on their wages should be reversed and the claim for credit allowed,

with costs and disbursements to the appellant against the Industrial Commissioner.

HILL, P. J., HEFFERNAN and FOSTER, JJ., concur; BLISS, J., dissents and votes to affirm.

Decision of the Appeal Board holding that the individual performers who composed the special acts upon whose wages the appellant paid unemployment insurance contributions during the year 1938 are employees of appellant reversed and such special acts and the individual performers working in them are held to be independent contractors and the disallowance of the claim for credit for contributions paid on their wages reversed and the claim for credit allowed, with costs and disbursements to the appellant against the Industrial Commissioner.